MIGEL et al. v. HELLER, HIRSH & CO.

(Supreme Court, Appellate Division, First Department. June 28, 1912.)

1. APPEAL AND ERROR (§ 864*)—REVIEW—EXTENT OF REVIEW—NATURE OF DECISION APPEALED FROM.

On the hearing of an appeal from a judgment after the dismissal of an appeal from the order denying a new trial, all controverted facts must be presumed to have been determined by the jury adversely to appellant.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1765-1767, 3456-3461; Dec. Dig. § 864.*]

2. CORPORATIONS (§ 629*)—SALE OF PROPERTY—AGREEMENTS—CONSTRUCTION AND OPERATION.

Plaintiff, defendant (a corporation), and another stockholder of an insolvent corporation agreed to purchase its property, title to be taken in the name of the individuals composing defendant as trustees for the benefit of the parties to the agreement in certain proportions. Subsequently, as an aid to a sale of the property, they formed a new corporation of which defendant had the management, to which ·the property was transferred, subject to mortgages to secure the interest of the beneficiaries and bonds issued to the beneficiaries to represent such interests. By a new agreement provision was made for payment of the bonds out of the profits, plaintiff's bonds to be preferred to those held by defendant, and it was provided that, on a sale of the property by the corporation or on a sale of its stock or a controlling interest therein, the net proceeds after payment of the indebtedness secured by the mortgage and the reimbursement of defendant for advances for stock in the new corporation should

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

be divided into two equal parts, one part to be paid to a broker for negotiating the sale, and the other part to be divided among the parties to the agreement in proportion to their interests, as specified in the first agreement, but if no sale took place within two years, plaintiff should share only in proportion to his bonds not previously paid. A sale was subsequently effected, but prior thereto the broker informed the parties that, as he intended to have an interest in the purchase, he waived his right to commission, and this waiver was considered in fixing the selling price. He subsequently released to defendant and the trustees in writing his claim for commissions, and he testified that he did so to protect the parties against such claim. *Held*, that plaintiff was entitled to share in the portion of the net proceeds of the sale which it was originally intended should be paid to the broker.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2478-2481; Dec. Dig. § 629.*]

3. CORPORATIONS (§ 629*)—SALE OF PROPERTY—AGREEMENTS—CONSTRUCTION AND OPERATION.
Under such agreement, defendant was not entitled to any additional share in the net proceeds by reason of the advances by it for stock, but was merely entitled to reimbursement for such advances.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2478-2481; Dec. Dig. § 629.*]

4. CORPORATIONS (§ 629*)—SALE OF PROPERTY—AGREEMENTS—CONSTRUCTION AND OPERATION.
Defendant did not acquire any right to an additional share in the profits by such release from the broker.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2478-2481; Dec. Dig. § 629.*]

5. JOINT ADVENTURES (§ 4*)—ADVANCES AND LOANS.
Advances by a party to a joint venture merely entitle him to reimbursement, and not to a greater share in the net profits.

[Ed. Note.—For other cases, see Joint Adventures, Cent. Dig. §§ 3-6; Dec. Dig. § 4.*]

Appeal from Trial Term, New York County.

Action by Moses C. Migel and another, as executors of Samuel A. Tuska, against Heller, Hirsh & Co. From a judgment for plaintiffs and an order denying a new trial, defendant appeals. Affirmed.

See, also, 146 App. Div. 936, 131 N. Y. Supp. 1129.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Nathan D. Stern, of New York City, for appellant.

Henry L. Scheuerman, of New York City, for respondents.

LAUGHLIN, J.   This action was brought to recover money alleged to have been received by the defendant to the use of the plaintiffs.

On the 29th day of April, 1908, the plaintiffs, as executors, held and owned certain bonds and capital stock of a corporation known as the Fisheries Company, which was insolvent, and on that day they entered into an agreement in writing with Gustave R. Tuska individually and with the defendant, a corporation, both of whom also owned bonds and stock in the said company. This agreement contemplated the purchase from the creditors' committee of the Fisheries Company

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of certain property consisting of real estate at Promised Land, Long Island, N. Y., and at Cape Charles, Va., for use as fishing plants and fertilizer sites for extracting oil and making fertilizer from fish, together with 11 steamers fitted out for fishing purposes, in exchange for their stock and bonds of the Fisheries Company, and certain other stock and bonds which they were to obtain, and provided that the title to the property thus acquired should be taken in the names of James E. Heller and Adolph Hirsh, who, as copartners in business as brokers and dealers in chemicals and fertilizers, had been succeeded by the defendant, in trust, however, for the three parties to the agreement, whose proportionate interests were therein stated and were approximately three-fifths for the defendant and one-fifth for each of the other parties. The property was to be preserved and managed by the trustees until sold by them, or transferred to the parties in interest, or to corporations to be formed for the purpose of disposing of and distributing it to their advantage, as therein provided. The property was acquired as thus contemplated. This tripartite agreement further provided, among other things, that, if the property should be sold, the net proceeds, after certain deductions for expenses and advances and for certain other payments, should be divided among the three parties in proportion to their holdings of bonds, and that upon demand of the defendant and one of the other beneficiaries the property should be conveyed by the trustees to corporations, "to be created for the purpose of distributing the interests of the several beneficiaries, but not to carry on business." Pursuant to the provisions of the agreement, the Atlantic Fertilizer & Oil Company was incorporated in December, 1908, to take over the property. The trustees had prior to this time disposed of the property at Cape Charles, and certain other property, and they executed a conveyance and transfer of the Long Island property and of the remaining property to the Atlantic Fertilizer & Oil Company, bearing date the 1st day of April, 1909, and acknowledged the 24th day of May thereafter, and it was duly recorded the next day.

The tripartite agreement also provided that the conveyance by the trustees to the corporation should be made "subject to purchase money mortgages to cover the interests of the said beneficiaries," and that bonds should be issued by the corporation to represent such interests, but it contained no provisions with respect to the amount of capital stock to be issued by the corporations to be formed, or with respect to who was to subscribe therefor, other than the provisions specifying the purpose for which the corporations were to be formed. On the 31st day of March 1909, which was after the incorporation, but prior to the conveyance to it, the trustees and G. R. Tuska, individually and as executor, entered into another agreement in writing reciting that the trustees were about to sell the property to the Atlantic Fertilizer & Oil Company, pursuant to the tripartite agreement, and to receive a mortgage and to distribute bonds, which were to be secured thereby, to the beneficiaries, and authorizing the transfer by the trustees, and containing certain provisions with respect to the terms of the mortgage, to be executed and bonds to be issued. It was therein provided

that the mortgage, which was to be for $200,000, should secure bonds for that amount at 6 per centum, with interest payable quarterly; that the bonds should become payable at the option of the holder on a sale of the mortgaged property by the company, and should be subject to redemption out of the profits of the company in five equal annual payments; that no dividends should be paid any year until the redemption of all bonds in arrears; that the bonds of the defendant should, except in the event of a foreclosure of the mortgage, be subrogated to the bonds of the other beneficiaries, but that on the payment of the bonds so preferred they should be canceled; that if the company should sell the property or its stock or a controlling interest in the stock either by corporate or individual action the proceeds, after paying the indebtedness secured by the mortgage and any other debt or obligation of the company, "and the amount of any stock subscription that Heller, Hirsh & Co., may have paid, shall be divided into two equal parts, one half to go to Mr. T. C. Meadows, and the other half to the beneficiaries under the tripartite agreement, in the proportions of their interest as in said agreement set forth," and that, if the sale should not take place within two years, the estate of the plaintiffs' testator and said Gustave R. Tuska should share in "said fifty per cent. of the net proceeds only in the ratio that the bonds under the mortgage aforesaid which they may still hold bears to the total number of bonds to be issued to them at the time of the execution of the mortgage; it being the intent of this arrangement that the share of these two interests in a moiety of the net proceeds aforesaid shall, after the said two years, be proportionate to their actual interests as bondholders." The authorized capital stock of the Atlantic Fertilizer & Oil Company was $100,000, consisting of 1,000 shares of the par value of $100 each, of which only 100 shares were issued. They were paid for by the defendant and held by it, with the exception that one share each was issued in the name of James E. Heller, Adolph Hirsh, and Bernard S. Heller to qualify them to act as directors. It was further provided in the agreement of March 31, 1909, that Gustave R. Tuska individually and the estate represented by the plaintiffs should be represented by one director on the board of directors of the company. On March 20, 1909, 11 days prior to this time, an agreement was executed between T. C. Meadows and the Atlantic Fertilizer & Oil Company which recites that the company was about to purchase said property "at the instance and request of said Meadows and with a view to establishing a fishing and fertilizer and oil manufacturing business," and reciting that the company would need funds for rebuilding its buildings and plant, and improving and repairing its steamers, and for operating and conducting its business, and Meadows agreed to advance funds to the company to the extent of $75,000 for said purposes on its promissory notes, and he thereby undertook to endeavor to sell the property of the company at a price satisfactory to it in consideration of which he was to receive one-half of the amount realized by the company on the sale over and above $200,000, the amount for which its bonds and mortgage were to be executed, as herein stated, plus the amount expended by the company for improvements and repairs "and the expenses incurred" by said

company "in its incorporation and for taxes and legal expenses"; and it was further provided that during the times the plants were operated the business was to be conducted under the management of a committee composed of James E. Heller, Adolph Hirsh, and Meadows. Although the agreement of March 31, 1909, does not expressly refer to this agreement, it is evident that the earlier one was executed in expectation that the later one would be made.

An agreement under seal bearing date the ——— day of July, 1909, between Gustave R. Tuska individually and Tuska and Migel as executors as parties of the first part, Heller and Hirsh individually and as trustees parties of the second part, the defendant party of the third part, and the Atlantic Fertilizer & Oil Company as party of the fourth part, was executed on the 17th day of September, 1909. It refers to the tripartite agreement and to the agreement of March 31, 1909, and quotes the provision of the latter with respect to the distribution of the proceeds on the sale of the property by the Atlantic Company, and recites that the sale of the property as thus contemplated had been consummated, and that the trustees had released the lien of the mortgage on certain of the property and had taken other security therefor, and provides in part as follows:

"First. The parties of the second, third and fourth parts hereby agree with the parties of the first part that any cash, shares, securities, rents, contracts, rights or advantages that may be received by or accrue to any of the parties of the second, third and fourth parts upon a sale of the mortgaged property or any part thereof within two years from the date of the execution of said mortgage or by a sale of the corporate stock of the party of the fourth part or the control thereof whether such transaction be by corporate or individual act, whether it be direct or indirect, whether it be by deed, bill of sale, lease, transfer, operating agreement or otherwise, such proceeds after deducting the amount of the mortgage aforesaid that may remain unpaid and any unpaid indebtedness or obligation of the party of the fourth part, and the amount of any subscription to the stock of the party of the fourth part that may have been paid by the party of the third part, shall be divided into two equal parts, one of which shall go to T. C. Meadows, Esq., and the other half to the beneficiaries under the tripartite agreement in the proportions of their interests as in said agreement set forth."

It was further provided therein that, if the sale should take place after two years, the parties of the first part should share in 50 per cent. of the net proceeds only in the ratio that the bonds secured by the mortgage, "which they may still hold bear to the total number of bonds issued to them at the time of the execution of the mortgage, * * * the intention being that after said two years their interest in such moiety shall be proportionate to their actual interests as bondholders."

[1] The defendant made a motion for a new trial pursuant to the provisions of section 999 of the Code of Civil Procedure, which involved a consideration of the facts, and it appealed from the order denying the motion, but the appeal was long since duly dismissed. The appeal from the judgment presents no question of fact, and it must be presumed that all controverted questions of fact were determined by the jury adversely to the appellant.

[2] The jury were justified in finding, on the testimony of Mr. Meadows, which was controverted by the testimony of Heller, but corroborated by the testimony of other witnesses, that after the agreements to which reference has been made were executed, and on the evening of March 28, 1910, at an interview between himself, Tuska, and James E. Heller, Ben Heller, his son, and Hirsh, representing the defendant, he informed them that he had an opportunity to sell the property, but that probably he would be interested in the purchase, and that, if he made anything out of it, it would be out of the purchasers, and that he did not wish to make "on both sides," and did not care to make profits at their expense, and desired to have the question of division of profits with him eliminated in fixing the selling price, and suggested that a fair price would be $200,-000, "which was the upset price prior to improvements," which had been made and that they receive, in addition, an amount equal to the "trading profits" of the company during the year ending April 1, 1910, by which was meant profits earned without deduction for improvements, and that his proposition which was to take the form of a purchase of the stock and bonds and not a transfer of property by the company was accepted. It appears by his testimony that he, not only deemed it improper that he should share in the profits, since he was to become a purchaser, but he expected that by thus waiving his commissions a lower selling price would be fixed, and that he would receive a partial benefit by acquiring a one-quarter interest in the company, the bonds of which were thus to be retired.

The evidence warranted a finding that in fixing the selling price the parties in interest were influenced by the fact that Meadows was not to share in the profits. On the 7th day of June, 1910, the parties who executed the tripartite agreement of April 29, 1908, executed another agreement in writing, drawn by the attorney for the defendant, referring to the agreement executed September 17, 1909, and reciting that the basis of an agreement for the transfer to Meadows and one Sickler of the stock and the bonds had been agreed upon, and authorizing the defendant to sell all the stock and bonds, pursuant to the terms of a proposed agreement between defendant and Meadows & Sickler, thereto annexed, and providing that the plaintiffs and said Gustave R. Tuska should be paid for their bonds with accrued interest out of the moneys received by defendant from the purchasers on account of the purchase of bonds, as therein provided, and that out of the proceeds of the sale of the stock there should be deducted by the defendant the sum of $10,000, the amount of their subscriptions for stock; and the expenses incurred in carrying out the sale of the stock and bonds, and there should be paid to plaintiffs and to said Tuska the same proportion of one-half the balance that the bonds held by them bore to the total amount of bonds issued and secured by the mortgage. Said proposed agreement between the defendant and Meadows & Sickler was executed under date of June 21, 1910. In the first paragraph or clause thereof it was provided that the purchasers would pay $100,000 for the stock and $200,000 with accrued interest for the bonds, less certain amounts then in the hands of the trustees; but the tenth paragraph or

clause shows that the sale was intended to be made on the same basis upon which the offer was originally made by Mr. Meadows, namely, the face value of the bonds plus an amount equal to the trading profits of the company during the year ending April 1, 1910, for it was therein provided that the books should be audited to verify schedules with respect to the financial business of the company during said year, which were used as the basis for making the contract, and that the purchase price of the stock was to be increased or decreased accordingly, as might be required by the audit of the books of the company. Shortly prior to the execution of the agreement of June 7, 1910, the controversy upon which this action is founded arose, and the defendant insisted that it would be entitled to the 50 per cent. of the net profits which Meadows originally was to receive as commissions for selling the property; and the plaintiffs and Gustave R. Tuska contended that those profits should be divided between the parties to the tripartite agreement in proportion to their holdings of the bonds. There is evidence tending to show that this claim on the part of the defendant had its origin in a suggestion of its counsel that under the former agreements plaintiffs had no interest in the share of the profits which Meadows was to have received, and that, until after that suggestion was made, there had been no claim by defendant that it was to take anything on account of its having furnished the money to pay for the capital stock that was issued, other than reimbursement therefor. It is quite evident that it was the intention of the parties in fixing a selling price to Meadows after he decided not to act as broker, or claim commissions, that the entire net profits of the sale should be divided between them in proportion to their respective interests in the property originally, as represented by their bond holdings. The fact that under the agreements, if plaintiffs obtained the benefit of the preference of their bonds by being paid by the company for part or all, they were only to share in the profits, if the sale occurred after two years, according to the bonds then held by them, is not inconsistent with this view of the evidence, and this construction of the contracts. The defendant was to have the active management of the company, which is doubtless the reason for giving plaintiffs' bonds a preference; and, if the funds of the company were expended in redeeming plaintiffs' bonds, it was right that defendant should have a greater share in the profits, if any, for it was running the risk of not having its bonds paid. In order that the opportunity for the sale might not be lost or delayed, it was provided in the agreement of June 7, 1910, which was drafted by the attorney for the defendant, that it was made without prejudice to the rights of the plaintiffs and Gustave R. Tuska, with respect to their claims to a proportionate share of the other one-half of the profits mentioned in said agreement of September 17, 1909, and, excepting as modified by this agreement, the rights of the parties, as they existed when the other agreement was made, were preserved.

[3] The agreement providing for the distribution of the proceeds on a sale of the property within two years from the date of the mortgage clearly contemplated that the defendant was to receive no special consideration, benefit, or advantage on account of its having subscribed

for the stock, but that it was merely to be reimbursed for the amount paid for the stock, and that the net profits were to be divided between the three beneficiaries of the trust agreement in proportion to their interests as represented by the bonds held by them. It was expected at that time that, if the property were sold, the sale would be effected through Meadows, who was to receive 50 per cent. of the net profits after payment of the bonds. It is quite plain that, when Meadows waived his claim to commissions and became a purchaser, the bondholders, in the absence of any other agreement, would be entitled to share, not merely 50 per cent. of the profits, but the entire profits, in proportion to the bonds held by them. Aside from denying certain allegations of the complaint, the only defense interposed by the answer was that Meadows failed to fully perform his agreement with respect to advancing money to the Atlantic Fertilizer & Oil Company, and that the defendant at his request advanced to it large amounts of money and indorsed and guaranteed for it also, and in consideration thereof he released his commission to the defendant. The theory upon which the case was tried appears to be that the defendant was entitled to the 50 per cent. of the profits which Meadows would have received had he acted as a broker in making the sale, on the ground that his claim was verbally or by writing released or assigned to it, and that, under the agreements, the obligation on the part of defendant was to account for it only to Meadows. The alleged verbal release or assignment depends upon conflicting evidence, and was submitted to the jury as a question of fact, and is therefore not reviewable.

[4] The claim to a release or assignment by writing is based upon a release under seal, dated the 7th day of June, 1910, which recites that Meadows, in consideration of $1 and other goods and valuable considerations, released and discharged the defendant and James E. Heller and Adolph Hirsh, the trustees, individually, is in the form of a general release without reference to this claim. According to the testimony of Meadows, which is controverted, but presumably was accepted by the jury, he was requested to execute this release owing to the fact that by the different agreements, to which reference has been made, he was apparently entitled to 50 per cent. of the net profits, and in order to protect the parties to whom it runs against his making a claim therefor. It may be observed that, if this release could be construed as an assignment of any claim that Meadows might have had, it would be an assignment, not to the defendant alone, but to James E. Heller and Adolph Hirsh as well. In so far as it is a release of Meadows' claim, it inures to the benefit of all those from whose interests his claim was to be paid. On the testimony of Mr. Meadows, he had no claim for commissions, which he could enforce, either directly or indirectly by assignment, and it is evident that he did not intend to authorize the defendant to assert any claim in his right.

[5] The fact that the defendant advanced certain moneys to the company at Meadows' request gave neither him nor it a right to commissions, or to share in the profits to a greater extent than to be reimbursed for the moneys so advanced, together with interest thereon. Although the original purpose not to conduct the business by the cor-

poration was departed from for a time, this was in furtherance of the purpose of the parties in interest to dispose of their interests to better advantage, and did not change their rights, as reserved by the original agreement, ultimately to share in the profits in proportion to their interests. They formed a corporation in name; but in fact their interests remained substantially the same as before, and moneys paid or advanced for stock, or in conducting the business, were, as between the parties, like advances by one partner, or joint venturer, over and above his share, which entitled him to reimbursement, but not to a greater share in the profits.

The other points urged in behalf of the appellant have been examined, but we find no error which requires discussion in the opinion. Moreover, such alleged errors, if serious, could not be prejudicial, for we are of opinion that the plaintiffs were entitled to recover as matter of law.

It follows, therefore, that the judgment and order should be affirmed, with costs. All concur.